ELIZABETH ANN SHAILER-SOLAK,
    *Plaintiff,*

   v.

NANCY A. BERRYHILL,
*Acting Commissioner, Social Security*
*Administration,*
    *Defendant.*

No. 3:16-cv-1681 (VAB)

**RULING AND ORDER ON MOTION TO REVERSE AND MOTION TO AFFIRM**
**THE DECISION OF THE ACTING COMMISSIONER**

On October 7, 2016, Elizabeth Ann Shailer-Solak ("Plaintiff") filed this administrative

appeal under 42 U.S.C. § 405(g) against the Acting Commissioner of Social Security

("Defendant" or "the Acting Commissioner"), seeking this Court's review of the decision of the

Social Security Administration ("SSA") denying her claim for Title II disability insurance

benefits and Title XVI supplemental security income ("SSI") under the Social Security Act.

Complaint, dated Oct. 7, 2016 ("Compl."), ECF No. 1.

Ms. Shailer-Solak moves to reverse the Acting Commissioner's decision. Motion to

Reverse, dated July 9, 2017 ("Pl.'s Mot."), ECF No. 23; Memorandum of Law in Support of

Motion to Reverse, dated June 9, 2017 ("Pl.'s Mem."), ECF No. 23-1. The Acting Commissioner

moves for an order affirming her decision.[1] Defendant's Memorandum of Law in Support of

Motion to Affirm, dated Sept. 11, 2017 ("Def.'s Mem."), ECF No. 27.

---

[1] While the Acting Commissioner only filed a supporting memorandum, it was docketed at the time of filing as a
motion. The motion thus did not technically comply with the Federal Rules of Civil Procedure or this Court's Local
Rules. *See* FED. R. CIV. P. 7(b)(1) ("A request for a court order must be made by motion. The motion must: (A) be in
writing unless made during a hearing or trial; (B) state with particularity the grounds for seeking the order; and
(C) state the relief sought."); D. Conn. L. Civ. R. 7(a)(1) (requiring motions involving disputed issues of law to be

For the reasons explained below, Ms. Shailer-Solak's motion is **GRANTED** and the Acting Commissioner's motion is **DENIED**. The Acting Commissioner's decision is **VACATED** and **REMANDED** for the calculation and payment of benefits.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Factual Background

Ms. Shailer-Solak, who is in her sixties, lives in Newington, Connecticut. *See* Transcript of Administrative Record, filed Jan. 27, 2017 ("Tr."), annexed to Answer, ECF No. 15, at 42. Since 2008, she has been diagnosed with several mental health conditions including major depressive disorder, post-traumatic stress disorder ("PTSD"), and alcohol dependence. Tr. 335, 627. These conditions have led Ms. Shailer-Solak to have repeated nightmares, panic attacks, and flashbacks. Tr. 634. She also reports having difficulty sleeping and, as a result of her PTSD, sleeps only a few hours per night on her couch. Tr. 860.

On several occasions, Ms. Shailer-Solak has experienced homelessness and reportedly lived out of a van. Tr. 587, 598–99. She currently lives alone in Newington. Tr. 855.

Ms. Shailer-Solak used to volunteer at the local town hall several times per week, and she reported that she would spend time by her condominium's pool. Tr. 858. By May 2017, however, she reported that she no longer engages in many of these activities. Tr. 857–58. She also does not maintain many social contacts and does not keep in touch with her family. Tr. 1096.

---

accompanied by a memorandum of law). Because this issue was not raised by the parties or the Court earlier, and because the memorandum otherwise substantively places Plaintiff and the Court on notice of the grounds for seeking the order and clearly states the relief sought, the Court exercises its inherent authority to manage its docket efficiently and construes the memorandum as a properly-filed motion to affirm. *See Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016) ("[D]istrict courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases.").

Since 2011, when she left her job at a gas station convenience store, Ms. Shailer-Solak has been out of the workforce. Tr. 855. She now seeks review of the Acting Commissioner's denial of benefits under Title II and Title XVI.

### 1. Treatment at InterCommunity Mental Health Group

Since February 2008, Ms. Shailer-Solak has been a patient at the InterCommunity Mental Health Group ("InterComm") in East Hartford, Connecticut. Tr. 335. She has primarily been treated by Brian Cardona, a licensed clinical social worker employed by InterComm. Tr. 854. She has also been seen by other medical practitioners at InterComm who have, among other things, managed her prescriptions and co-signed Mr. Cardona's reports and treatment notes, including Dr. Ann Price, Dr. Anees Ahmed, and Advance Practice Registered Nurse Carole Montano. Tr. 584, 725, 1150.

These providers have noted that Ms. Shailer-Solak "lack[ed] relapse prevention skills" and had "poor interpersonal communication skills, poor problem-solving and decision-making skills[.]" Tr. 1096. Additionally, she has had "intrusive memories" several times per week, daily hypervigilance, flashbacks twice a week, and nightmares every night about "bad dreams of bad things from the past." *Id.*

Mr. Cardona completed two Mental Impairment Questionnaires during Ms. Shailer-Solak's treatment with Intercomm: (1) on December 18, 2013, co-signed by Dr. Ahmed. Tr. 709; and (2) on December 15, 2015, co-signed by Nurse Montano, Ms. Shailer-Solak's medication provider. Tr. 1150. Both questionnaires indicate that Ms. Shailer-Solak experienced a flight of ideas, hyperactivity, sleep disturbance, easy distractibility, emotional withdrawal and isolation, and "recurrent obsessions or compulsions which are a source of marked distress." Tr. 710, 1146. They also state that Ms. Shailer-Solak: (1) is "unable to meet competitive standards" in

3

responding to changes in routine work settings, working in coordination with or proximity to others, and performing at a consistent pace, Tr. 711, 1147; and (2) has "marked" difficulties in maintaining social functioning, extreme restrictions in daily life and in maintaining concentration, persistence, or pace, and has experienced four or more "episodes of decompensation within [a] 12 month period." Tr. 713, 1149.

### 2. Non-Treating Medical Sources

Ms. Shailer-Solak has also been evaluated by several sets of non-treating examiners throughout the course of her claim. Ms. Shailer-Solak was referred for these assessments by the State of Connecticut Bureau of Rehabilitation Services/Disability Determination Services.

### a. Diane Reese, LCSW, and Margarita Hernández, Ph.D.

In February, 2012, Ms. Shailer-Solak underwent a mental status assessment with licensed clinical social worker Diane Reese and licensed clinical psychologist Margarita Hernandez. Tr. 622. This evaluation included a review of her medical records as well as a clinical interview. Ms. Reese and Ms. Hernández made behavioral observations and clinical impressions in their report after Ms. Shailer-Solak's examination. Tr. 626.

On February 7, 2012, Diane Reese examined Ms. Shailer-Solak. Tr. 622. Her report recounted Ms. Shailer-Solak's health history, and noted that "Ms. Shailer [sic] was alert, cooperative, and made regular eye contact . . . She was friendly and euthymic . . . . She was oriented to person, place, and time. Thought process was goal directed, logical, and there was no evidence of loose association or tangential thinking." Tr. 626. Additionally, she reported that "[n]o prominent problems were observed with regard to immediate, recent, or remote memory," and that Ms. Shailer-Solak "demonstrated adequate attention and concentration skills." *Id.* Ms.

Reese concluded, however, that her "diagnostic impression" of Ms. Shailer-Solak suggested depressive and anxiety disorders, as well as PTSD and alcohol abuse. Tr. 627.

Ms. Reese concluded that Ms. Shailer-Solak frequently attempts to cope with her symptoms by resorting to alcohol and drug use, but also that she "appears to minimize her feelings of depression and anxiety." Tr. 627. Her PTSD led to her "having startled responses to common things such as a phone ringing or someone raising his hand," but "it appears as if she minimizes her symptoms so that she can feel some sense of being in control." *Id.* Ms. Shailer-Solak's anxiety also "parallels her feelings of depression and anxiety in that she feels anxious when she feels she can't cope," and Ms. Reese noted that "[w]hen these feelings become so intense she often seeks help by going to the emergency room for a crisis evaluation and possible admission to a psychiatric unit." *Id.*

Ms. Hernández reviewed and co-signed Ms. Reese's findings. Tr. 627.

### b. Steven Kahn, M.D.

In July 2012, Dr. Steven Kahn, M.D. conducted a disability evaluation of Ms. Shailer-Solak. Tr. 632. His report noted that "[i]n terms of her formal mental status exam" she was "cooperative, makes good contact," and was "able to follow the instruction" of several tests "with moderate complexity properly and she was able to remember three out of three words after several minutes, suggesting short-term memory was intact." Tr. 633–34.

Dr. Kahn, however, concluded that his "diagnostic impression would be that [Ms. Shailer-Solak] does suffer from major depression recurrent, which at this point is slightly improved [sic] on the Lexapro, but she is still quite symptomatic . . . ." Tr. 634. He also concluded that she had "panic disorder with a degree of agoraphobia and she still gets several

panic attacks a week and also PTSD which manifests itself at least partially in terms of occasional flashbacks and bad dreams." *Id.*

### c. State Agency Evaluations

State agency psychiatrist Dr. Janine Swanson, PsyD and Warren Leib, Ph.D. also examined Ms. Shailer-Solak. Tr. 85, 110.

On February 22, 2012, Dr. Swanson concluded that while Ms. Shailer-Solak's anxiety and affective disorders were "Severe," she only experienced mild restrictions in her daily living, moderate difficulties maintaining social function, mild difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation. Tr. 84. Dr. Swanson concluded that Ms. Shailer-Solak "can adjust to other work." Tr. 88.

On July 25, 2012, Dr. Leib examined Ms. Shailer-Solak and reached the same conclusions as Dr. Swanson. Tr. 110–11.

### B. Procedural History

On November 28, 2011, Ms. Shailer-Solak applied for Title II disability insurance benefits and for Title XVI supplemental security income, alleging being disabled since January 31, 2010. Tr. 46–49, 50–58. Her applications were first denied on February 24, 2012, and then denied again upon reconsideration on July 30, 2012. Tr. 136–39; 140–43; 146–48; 149–51.

On August 22, 2012, Ms. Shailer-Solak filed a written request for a hearing before an Administrative Law Judge. Tr. 153. On September 5, 2012, the SSA granted her request. Tr. 154.

### 1. Initial Administrative Hearing

On January 14, 2014, the SSA held a hearing on Ms. Shailer-Solak's applications in Hartford, Connecticut. Tr. 12. Ms. Shailer-Solak appeared, represented by counsel, before

Administrative Law Judge ("ALJ") Ryan A. Alger. *Id.* Ralph E. Richardson, an impartial

vocational expert, also appeared. *Id.* The hearing lasted a total of 32 minutes. Tr. 61, 75.

In response to questions from the ALJ, Ms. Shailer-Solak testified that she was fifty-five

years of age, graduated from high school, and completed one year of college education. Tr. 63.

The last job she held was as a cashier and stock person at Food Bag Citgo Station. *Id.* She

testified that she worked there from May 2010 until April 2011, but quit because her boss was

"very mean." Tr. 63–64. Before Citgo, she worked as a cashier in a corporate cafeteria

restaurant. Tr. 64.

She explained that she could not go back to work because she has "too many

appointments" to keep "and too many groups" she was attending "to help myself get better." *Id.*

She explained that she had just started several therapy groups including a trauma group, a

women's group, and Alcoholics Anonymous ("AA") meetings. *Id.*

Ms. Shailer-Solak testified that she was no longer engaged in her volunteer work with

Human Services at Newington Town Hall, where she used to help with the food pantry and

clothing closet. *Id.* She estimated that the last time she had regularly volunteered was in Spring

2013, and that she had done a "very little bit" of volunteering in the fall. Tr. 64–65.

Ms. Shailer-Solak testified that she was living alone and supported herself with a HUD

grant, food stamps from the state of Connecticut, and cash assistance. Tr. 65. She said she does

not visit with friends or family on a regular basis and drives herself to all of her appointments—

except that she had relied on a friend the day of the hearing because she didn't have enough

money for gas or parking. Tr. 65–66.

Ms. Shailer-Solak's attorney then asked her to describe her level of alcohol use. Tr. 66.

She testified that she drank five "nips"—i.e., small airline-size bottles—of tequila the day before,

and that she periodically drank two nips a day. *Id.* She used alcohol because it "numbs the pain and the anxiety temporarily," but "[i]t always comes back after." *Id.*

Ms. Shailer-Solak explained that she sees Bryan Cardona for one-on-one therapy weekly, that she attends two groups per week, and that she sees Dr. Ahmed for medication review. Tr. 66–67. All of this treatment is necessary, she said, because she has experienced significant trauma in her life "that seems to be getting in the way of [her] functioning," causing her to "freeze" and preventing her from performing basic daily functions. Tr. 67. She further reported suffering from regular panic attacks and flashbacks, Tr. 68, and stated that she is unable to get out of bed two to three times a week. She also reported going days without eating, testifying that she had not eaten since last week and that she has gone without food for as long as two weeks. *Id.* Her sleep schedule, she said, was extremely inconsistent, plagued with bad dreams and/or panic attacks. Tr. 68–69. She also reported regularly going days without bathing. Tr. 69.

Finally, Ms. Shailer-Solak testified that she could not even maintain enough mental focus to watch television; when she tried to, she said, she drifts, focusing instead on whatever pops into her head, including flashbacks. *Id.* She also described suffering from obsessive behavior, mainly involving counting, for several years. Tr. 69–70.

The ALJ then heard testimony from Mr. Richardson, who reviewed the claim file and exhibits to familiarize himself with Ms. Shailer-Solak's vocational background. Mr. Richardson explained that Ms. Shailer-Solak had experience in five occupational titles bearing a range of exertional demands and skill levels: (1) bookkeeper, 210.382-014, sedentary, SVP-6,[2] skilled; (2)

---

[2] Specific vocational preparation ("SVP") "refers to the amount of time required for a typical claimant to learn the techniques, acquire the information, and develop the facility needed for average performance in a job." *Lebron v. Comm'r of Soc. Sec. Admin.*, No. 17-cv-4400 (ER)(KHP), 2018 WL 6787166, at *2 n.1 (S.D.N.Y. Dec. 26, 2018) (citation omitted). "SVP ratings are used as a guideline for determining how long it would take a claimant to achieve average performance in a job as part of the Commissioner's evaluation of whether the claimant's past work is relevant. The Commissioner considers a claimant's education when evaluating whether the claimant performed a job long enough to learn it." *Id.* (citations omitted). SVP may be acquired "in a school, military, institutional or

8

cashier, stocker, 290.477-714, light, SVP-3, semi-skilled; (3) CNA, 355.674-014, medium, SVP-4, semi-skilled; self-service gas station attendant, 211.462-010, light, SVP-2, unskilled, and (5) hostess/restaurant, 352.677-010, light, SVP-3, semi-skilled.

The ALJ and the witness then engaged in the following colloquy:

> Q: Please assume the individual the same age, education and work experience as the claimant limited to medium work. Carry out and remember simple instructions. Handle an environment with few changes in the workplace with occasional interaction with coworkers. No interaction with general public. Can this hypothetical individual do the past work of the claimant?
> A: No, Your Honor.
> Q: Are there other jobs in the local or national economy that person could do?
> A: Night cleaner, 381.687-018, SVP-2, unskilled, medium, state 1,700, nationally 305,000. Hand packer, 559.687-074, SVP-2, unskilled, light, state 1,400, nationally 234,000. Inserter, 731.685014, unskilled, SVP-2, sedentary, state 1,100, nationally 242,000.
> Q: If I add to that hypothetical, you gave me a range of light and sedentary. I'm not going to change the exertional level. If I add that the individual could not maintain their concentration and would be off-task 20 percent of the workday needing a break every hour of about 10-12 minutes, would those positions allow for that?
> A: No, Your Honor.
> Q: Would there be any others?
> A: There would be no work.

Tr. 71–72. Mr. Richardson further clarified that in the first hypothetical, if the person was absent from work three or more days per month, the jobs he had identified would not be available to them. Tr. 73.

Finally, the ALJ asked Ms. Shailer-Solak her weight, and why she drank more than a couple of nips the day before. *Id.* She testified that she weighed 124 pounds, and that she had been anxious about the hearing and unable to find her driver's license. *Id.*

---

vocational environment," including through vocational training, apprenticeship training, in plant training, on-the-job training, and through essential experience in other jobs. *See* SSA, PROGRAM OPERATIONS MANUAL SYSTEM ("POMS"), DI 25001.001A.77, https://secure.ssa.gov/poms.nsf/lnx/0425001001#a77 (last visited Mar. 14, 2019).

### 2. First ALJ Decision

On February 24, 2014, the ALJ issued a written decision denying Ms. Shailer-Solak's claim for disability and disability insurance benefits and supplemental security income. Tr. 9–11. The ALJ found that Ms. Shailer-Solak was not disabled under sections 216(i) and 223(d) of the Social Security Act (for purposes of Title II benefits), nor was she disabled under section 1614(a)(3)(A) of the Act (for purposes of Title XVI benefits). Tr. 25.

The ALJ concluded that while the medical evidence supported a finding of an affective disorder and an anxiety disorder, these impairments would not meet listing-level severity. Tr. 14–15. This determination was largely based on the ALJ's conclusion that Ms. Shailer-Solak experienced only minor restrictions in her daily living, moderate difficulties in her social functioning, and moderate difficulties with concentration, persistence and pace. Tr. 16.

With respect to residual functional capacity, the ALJ found that Ms. Shailer-Solak could perform "medium work," "except she can understand, remember and carry out simple instructions for simple, routine tasks in an environment with few workplace changes." *Id.* The ALJ also found that Ms. Shailer-Solak "can tolerate occasional interaction with coworkers" but "none with the public." *Id.*

While the ALJ found that Ms. Shailer-Solak could not return to her previous occupation, he nevertheless concluded that there were jobs Ms. Shailer-Solak could perform and that existed in significant numbers in the national economy. Tr. 24. Further, he found that while Ms. Shailer-Solak had limitations that prevented her from performing all or substantially all of the requirements of "medium work," she nevertheless was able to perform the requirements of certain jobs, such as night cleaner, hand packer, and inserter. *Id.*

The ALJ therefore concluded Ms. Shailer-Solak was "not disabled" and "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *Id.*

### 3. Appeal of ALJ Decision

On May 30, 2014, Ms. Shailer-Solak requested a review of the ALJ's ruling by the SSA's Appeals Council. Tr. 7. On August 27, 2014, the Appeals Council declined her request. Tr. 1.

On September 15, 2014, Ms. Shailer-Solak filed an appeal with the United States District Court for the District of Connecticut. S*ee* Complaint, dated Sept. 15, 2014, No. 3:14-cv-1328 (JGM), ECF No. 1. The appeal was assigned to United States Magistrate Judge Joan G. Margolis.

On January 30, 2015, Ms. Shailer-Solak moved to reverse the decision of the Acting Commissioner. *See* Motion to Reverse, dated Jan. 30, 2015, No. 3:14-cv-1328 (JGM), ECF No. 14. She argued that the ALJ committed two errors: (1) at Step Three of the disability determination, the ALJ failed to accord the primary treating physician's and counselor's opinions requisite weight and deference, failed to provide good and sufficient reasons for discounting those opinions, and substituted his own opinion for that of the medical expert; and (2) at Step Five, the ALJ failed to include all impairments and limitations in his determination of residual functional capacity, resulting in a determination not supported by the record and insufficient to satisfy the Acting Commissioner's burden at this step. *See* Memorandum in Support of Motion to Reverse, dated Jan. 30, 2015, No. 3:14-cv-1328 (JGM), ECF No. 14-1, at 17–31, 31–34.

On April 9, 2015, the Acting Commissioner moved, with Ms. Shailer-Solak's consent, to reverse the decision of the ALJ under Sentence Four of 42 U.S.C. 45(g) and remand for further proceedings:

> Upon remand, the Social Security Administration Appeals Council
> will remand this case to an ALJ. Plaintiff will be given an
> opportunity for a new hearing and to submit additional evidence in
> accordance with 20 C.F.R. §§ 405.331 and 405.350. The ALJ will
> reassess plaintiff's maximum residual functional capacity, and in so
> doing, reevaluate the medical and other opinions of record. The ALJ
> will also reassess whether plaintiff can perform past relevant work
> and/or make an adjustment to other work that exists in significant
> numbers, obtaining vocational expert testimony, if warranted. The
> ALJ will then issue a new decision.

Consent Motion to Remand, dated Apr. 9, 2015, No. 3:14-cv-1328 (JGM), ECF No. 17, at 1–2.

That same day, the court granted the Acting Commissioner's motion, as well as Ms.

Shailer-Solak's motion (to the extent that a remand was agreed to). Electronic Orders, dated Apr.

9, 2015, No. 3:14-cv-1328 (JGM), ECF Nos. 18–19. On April 15, 2015, the Acting

Commissioner filed an amended motion, which the Court granted. Amended Consent Motion to

Remand, dated Apr. 15, 2015, No. 3:14-cv-1328 (JGM), ECF No. 20; Electronic Order, dated

Apr. 15, 2015, No. 3:14-cv-1328 (JGM), ECF No. 21. On April 16, 2015, the Clerk of the Court

entered a judgment reversing the Acting Commissioner's decision and remanded the case to the

agency for further proceedings. Judgment, dated Apr. 16, 2015, No. 3:14-cv-1328 (JGM), ECF

No. 22; *see also* Tr. 896.

### 4. Proceedings on Remand

On September 1, 2015, the Appeals Council vacated the final decision of the Acting

Commissioner and sent the case back to the ALJ for further proceedings consistent with the

order of the court, stating that "[f]urther evaluation of the opinion evidence is warranted."

Tr. 902.

The Council explained that Brian Cardona, Ms. Shailer-Solak's treating therapist, had

indicated more restrictive mental limitations than identified by the ALJ, but that "the decision

does not provide adequate rationale when according little weight to this opinion." Tr. 902. The

Appeals Council specifically noted: (1) that the decision does not evaluate the numerous low GAF scores in the record that support Cardona's opinion; (2) that the decision "inaccurately relies on volunteer and part-time work that appears to show the claimant cannot function in a regular work environment"; and (3) that the decision does not discuss evidence that indicates the claimant has either few or no friends, and no social peer support. *Id.* Finally, the Council found that further evaluation of the non-treating source opinions of Dr. Margarita Hernandez and Dr. Steven Kahn was warranted "because they include statements that tend to show greater limitations" than were described in the decision. *Id.*

The Appeals Council therefore ordered the ALJ to take three steps:

- Obtain updated evidence concerning the claimant's impairments in order to complete the administrative record in accordance with the regulatory standards regarding existing medical evidence (20 CFR 404.1512-1513 and 416.912-913). Additional evidence may include, if warranted and available, a consultative examination and medical source statements about what the claimant can still do despite her impairments.
- Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p). In so doing, evaluate the opinion evidence in the record, with specific consideration of the opinion evidence in [the consultative examination report of Diane Reese, LCSW, Steven Kahn, MD, and impairment questionnaire filled out by Brian Cardona, LCSW] and explain the weight given to such opinion evidence.
- If warranted by the expanded record, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base . . . . The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole . . . .

Tr. 903.

On May 10, 2016, the SSA held a second hearing on Ms. Shailer-Solak's applications in Hartford, Connecticut. Tr. 825. Ms. Shailer-Solak appeared, represented by counsel, before the

same ALJ, Ryan A. Alger. *Id.* Michael Dorval, an impartial vocational expert, also appeared. *Id.* The hearing lasted a total of 22 minutes. Tr. 850, 867.

At the outset, the ALJ explained "a few things":

> I first want you to know that I do have before me your application for benefits under the Social Security Act. I also have the prior decisions in your case from both here at the hearing level, my decision, and also the Appeals Council decisions and the U.S. District Court remand and subsequent Appeals Council remand and I have read all of those prior decisions in your case. I am not bound by any prior decisions in your case. I will make my decision based on the evidence that I have in my record and also the testimony that I hear today.

Tr. 850–51. The ALJ then discussed exhibits, noting that it appeared exhibits 22 through 25 were newly filed since the previous hearing. Tr. 852.

In response to questions from the ALJ, Ms. Shailer-Solak testified she had not worked, even part time, since 2011, and that she still lived alone. Tr. 855. She explained that she no longer has a car and travels to hear various appointments using a medical van, but that a caseworker brought her to the hearing. Tr. 856. She testified that she was under the regular care of a caseworker, who she sees at least once a month and regularly checks in with by phone. *Id.*

Ms. Shailer-Solak testified that she was no longer using alcohol as the result of a new recently-prescribed medicine, and that she was no longer attending AA meetings. *Id.* She also testified that she continues to see Mr. Cardona for counseling with respect to alcohol use, depression, and anxiety. Tr. 856–57. She later clarified, in response to a question from her attorney, that she sees him at least twice a month. Tr. 861.

Ms. Shailer-Solak testified that she does not have any family, that she does not associate with her neighbors, and that she engages in very few activities outside her home apart from food shopping and doctor's appointments. Tr. 857. She testified that she still ate inconsistently. *Id.*

She also said that she had abandoned many other regular activities; for example, she no longer sits out on her deck or walks in the park. Tr. 857–58.

She testified to taking several medications, but also to having stopped several of them due to side effects. Tr. 858. She said she had recently started taking clonidine to address nightmares and PTSD symptoms, as well as an opioid blocker; the latter, however, was causing her to black out like she did during high school. Tr. 858–59. She also testified to an inability to focus on a television program, and to a decline in her short-term memory. Tr. 859.

In response to questions from her attorney, Ms. Shailer-Solak testified that she experiences panic attacks every day, which can be triggered by "people's behaviors" as well as her "whole living situation." Tr. 860. She also explained that she no longer sleeps on her bed; instead, she "live[s] on" her couch because beds "trigger[] bad things[.]" *Id.* She explained that she generally does not sleep through the night, noting that she had been awake since 2:00 a.m. the day of the hearing. Tr. 861.

In addition to her visits with Mr. Cardona, which occur at least twice a month, Ms. Shailer-Solak testified that she sees Carol Montano at InterComm for medication, as well as an additional primary care doctor. Tr. 861–62.

The ALJ then heard testimony from Mr. Dorval, the vocational expert, who reviewed the claim file and exhibits to familiarize himself with Ms. Shailer-Solak's vocational background. The ALJ and Mr. Dorval then engaged in the following colloquy:

> Q: First, assuming someone of the same age, education, and work experience as the claimant. If the person could do medium work, as defined. They could carry out and remember simple instructions in a workplace with few changes. They could have occasional interaction with coworkers, but no interaction with the general public. Under that hypothetical could such a person do any of the claimant's past work?
> A: No, Your Honor. It involves public contact.

Q: Okay. And are there other jobs in the national economy that such a person could do?

A: There are, Your Honor, and I would cite the following positions at the medium exertional level. This would include a laundry worker, DOT 361.684-014. 1,000 jobs in Connecticut. 104,000 nationally. This person could be a cleaner janitor, DOT 323.687-010. 800 jobs in Connecticut. 75,000 jobs nationally. And a person could be a dishwasher, DOT 318.687-010. 2300 jobs in Connecticut and 199,000 nationally.

Q: Okay. Thank you. Now if I added to that hypothetical that the person – let me just change that for a second. If I made the hypothetical a light exertional level, but still only occasional interaction with coworkers and no interaction with the general public would that person be able to do any of the claimant's past work?

A: No, Your Honor.

Q: No. Okay. Because – it's the public interaction with the past jobs?

A: Correct.

Q: Okay. Let me add to the first hypothetical that the person would be off task at least 15% or more of the workday. Would any jobs accommodate that?

A: No full-time jobs for that individual, Your Honor.

Tr. 864–65. Mr. Dorval then explained (in response to a question from Ms. Shailer-Solak's attorney) that if, in the first hypothetical, the person would also be absent two or more times a month, there would not be any jobs available for them on a full-time basis. Tr. 865.

Ms. Shailer-Solak added that she had attempted to attend a six-week wellness clinic at the senior center in Newington on Mondays, but that she had been unable to attend the sessions consistently because of either sleep habits or transportation issues; she testified to not being able to do something she set out to do for six weeks in a row. Tr. 866.

### 5. Second ALJ Decision

On August 1, 2016, the ALJ issued a written decision, again denying Ms. Shailer-Solak's applications and concluding that she was not disabled. Tr. 825–42.

At Step One, the ALJ concluded that Ms. Shailer-Solak had not engaged in substantial gainful activity since January 31, 2010, the alleged onset date of her conditions. Tr. 828.

At Step Two, the ALJ identified, in addition to affective disorder and anxiety disorder, three additional impairments not listed in his previous decision: posttraumatic stress disorder (PTSD), personality disorder, and alcohol abuse. Tr. 828. The ALJ concluded that these impairments were severe, and caused "significant limitations in [Ms. Shailer-Solak's] ability to perform basic work activities[.]" *Id.*

At Step Three, the ALJ concluded that Ms. Shailer-Solak "does not present with an impairment that, either singly or in combination, medically meets or equals the severity requirements of any listed impairment" in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). Tr. 828–29. The ALJ reached this result after determining that Ms. Shailer-Solak did not have a "marked limitation" in either her activities of daily living, in maintaining social functioning, or in maintaining concentration, persistence, or pace; nor did she have repeated episodes of decompensation, each of extended duration. Tr. 829. The ALJ found that Ms. Shailer-Solak had only "mild restriction" in her daily living activities as a result of her impairments, based on evidence in the record:

> In the December 4, 2011 Activities of Daily Living Report, the claimant reported spending a lot of time out walking with her dog (Exhibit 4E). She indicated that she had no problems dressing or grooming and that she prepared her own meals and ate when hungry, which was rarely. She cleaned, organized and did laundry. She went out daily for fresh air and sunshine. She shopped for food in stores, but not often and not for long. As for her hobbies and interests, the claimant reported that she used to enjoy doing crafts but was unable to afford it. She listened to the radio, played board games and performed word searches. She stated that she was less motivated to engage in these activities when depressed. She also revealed that she had volunteered at Human Services and Kiwanis (Id.). At a February 7, 2012 consultative evaluation, the claimant reported that she kept herself busy by volunteering at the town hall through human services, helping out the elderly, and doing a lot [of] walking (Exhibit 12F, p. 4). For leisure, she indicated that she likes to read, listen to music, walk and sit on her deck to watch the animals, go to listen to free music on Wednesday nights and attends church on

Sundays (Id.). With regard to completing daily activities, she asserted that she is independent and self-motivated. She can do her own grooming, cleaning, shopping, and cooking (Id.). At a second consultative examination performed on July 20, 2012, the claimant reported hanging out in the pool in warmer weather. As documented later in this decision, the claimant's treatment records contain consistent reports of part-time work activity during the relevant period. As the claimant has an adequate level of daily activities, I find that she has no more than a mild restriction in her activities of daily living.

Tr. 829. The ALJ then concluded that Ms. Shailer-Solak has only "moderate difficulties in social functioning":

The claimant testified that she can take [a] medical van to her appointments and is able to do her own food shopping, but does not socialize with her neighbors. However, the medical evidence shows that she had a higher level of social functioning at times. In the December 4, 2011 Activities of Daily Living Report, the claimant reported that she tried to socialize daily by having conversations or just listening (Exhibit 4E). She had volunteered at Human Services and Kiwanis (Id.). At the February 7, 2012 consultative evaluation, the claimant reported that she is able to take public transportation without assistance, is sociable and able to communicate well with others (Exhibit 12F, p.4). She also described her interactions as appropriate and effective (Ibid.). She had difficulty with a boss at a gas station and had occasional conflicts with her neighbors (Ibid). On examination, consultative examiner Dr. Margarita Hernandez, observed that the claimant was alert, cooperative, friendly, made regular eye contact, was relaxed, had a good attitude, normal speech and rapport was easy to establish (Id. at 5). At the second consultative examination performed on July 20,2012, the claimant reported having very little social contact with her family or any friends (Exhibit 14F). On mental status examination, Dr. Steven Kahn observed that the claimant was cooperative, made good eye contact and had normal speech. As documented later in this decision, the claimant's mental status examinations over the course of her treatment show that she generally had a depressed/anxious mood with congruent affect (Exhibits 23F, 24F). However, the severity of her symptoms was consistently described as moderate and there was a time the claimant denied any anxiety and depression when she was complaint [sic] with her medications. I have accounted for any mood lability the claimant might experience which would result in difficulty interacting with others even though

18

> she was generally cooperative. Therefore, I find that she has
> moderate difficulties in social functioning.

Tr. 829–30. Next, the ALJ found Ms. Shailer-Solak had "moderate difficulties" in "maintaining concentration, persistence or pace":

> The claimant testified that her memory has worsened. The record reflects that the claimant has been able to provide a very detailed work history and account of her daily activities (Exhibit 4E, 5E). She provided a detailed family and medical history to consultative psychological examiner, Dr. Hernandez and to her examining and treating providers (Exhibits 2F, 6F, 7F, 12F, 14F). On mental status examinations, the claimant's thought processes were normal and her memory was assessed as intact (Exhibits 12F, 14F, 1 5F, 22F). She demonstrated adequate attention and concentration at both consultative psychological examinations, but treatment notes document occasional complaints of difficulty concentrating (Exhibits 12F, 14F). The claimant has reported working part-time for a gas station from June 2010 until April 2011 (Exhibit 12F at 4). She left the job because she felt she was being mistreated by her boss, which suggests that there were no issues with her task performance (Ibid.). As documented later in this decision, the claimant's more recent mental status examinations over the course of her treatment show that she had impaired concentration and memory problems (Exhibits 23F, 24F). However, as her treatment progressed, she no longer had memory problems. Otherwise, she had a logical thought process, no abnormal thoughts and was alert and oriented. I have accounted for any deficiencies in concentration the claimant might experience and find that she has no more than moderate difficulties in maintaining concentration, persistence or pace.

Tr. 830. Finally, the ALJ found no episodes of decompensation of an extended duration, and "no medical evidence of exacerbations or temporary increases in the claimant's symptoms or signs, accompanied by a loss of adaptive function." Tr. 830.

The ALJ therefore concluded that "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied." Tr. 830. The ALJ further concluded that Ms. Shailer-Solak could not satisfy the "paragraph C" criteria,

because "she has not experienced repeated episodes of decompensation, a residual disease process resulting in marginal adjustment that a minimal increase in mental demands or change in environment that would cause decompensation, or a current history or 1 or more years' inability to function outside of a highly supportive living environment. Additionally, her anxiety has not resulted in a complete inability to function independently outside her home." Tr. 831.

At Step Four, the ALJ determined that Ms. Shailer-Solak has the residual functional capacity to perform "medium work as defined in 20 CFR 404.1567(c) and 416.967(c), except she is able to carry out and remember simple instructions, in an workplace environment with few changes, occasional interactions with coworkers and none with the public." Tr. 831. The ALJ found that:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. The claimant's treatment notes show that she has generally done well when compliant with psychiatric medications and follow-up, even when she was not abstinent from substances. Her treatment notes generally show that her symptoms were described as moderate. Notwithstanding her noncompliance with follow-up and her medications, the claimant was able to work part-time for long stretches during the relevant period and also engage in volunteer work. Her noncompliance usually coincides with her mood (ability and memory problems, both of which improve as she becomes more compliant. Her more recent treatment notes demonstrate that she learned helpful coping mechanisms deal with her symptoms and that her symptoms also improved with medications. She testified that she was experiencing one of her daily panic attacks during the hearing, but she was still able to answer questions and respond appropriately. Although her demeanor limits her social interactions in some capacity, it does not preclude all work related activity. Her mental status examinations also show positive findings of mood, affect, concentration and memory abnormalities at times. I have accounted for the foregoing and find that the claimant is limited to carrying out and remembering simple instructions, in an workplace environment

with few changes, occasional interactions with coworkers and none with the public. Although the claimant does not present with any physical impairments, I have accounted for any sedating effects of her medications in combination with mental fatigue she might experience due to her symptoms in limiting her to a medium exertional capacity. The residual functional capacity has fully accounted for the claimant's abilities and limitations as supported by the objective medical evidence.

Tr. 838.

The ALJ then explained why he afforded little weight to the opinions of treating physician Brian Cardona, Ms. Shailer-Solak's primary therapist, who had found Ms. Shailer-Solak had extreme restrictions that resulted in her "complete inability to function outside the area of her home" and inability "to meet competitive standards in unskilled, semiskilled and skilled work." Tr. 838.

I afford little weight to the opinions of Mr. Cardona, as they are overstatements of the claimant's limitations and are not supported by the medical evidence. As mentioned previously, the individual therapy and medication management sessions document the claimant's reports of volunteer and work activity and social activities with friends and neighbors. These activities do not support the marked/extreme restrictions, serious limitations or inability to meet competitive standards as found by Mr. Cardona. Mr. Cardona's limitations are also inconsistent with the findings on mental status examination. The claimant only had impaired concentration and problems in her memory at times on examination (Exhibits 23F, 24F). Otherwise, her memory improved with treatment and she was cognitively intact with a logical thought process, no abnormal thoughts and full orientation. The claimant also had abnormalities of her mood and affect on examination, however, her symptoms were consistently described as moderate, which does not reflect Mr. Cardona's level of limitations. Even though Mr. Cardona's opinion was cosigned by an acceptable medical source, Dr. Ahmed, it is not very persuasive because it does not indicate whether these limitations are a result of the claimant's noncompliance, which was documented by Dr. Ahmed (Exhibit 23F). Finally, Mr. Cardona's statement that the claimant is unemployable is given no weight as it is conclusory.

Tr. 839. The ALJ also afforded only limited weight to the opinions of two other treating

physicians, Ann Price and Ali Erol. *Id.*

The ALJ then explained why he felt the GAF scores were entitled to little weight:

> I afford little weight to the claimant's GAF scores below 50, ranging as low as 32, which according to the *Diagnostic and Statistical Manual of Mental Disorders, 4th edition* indicates major impairments in areas of functioning (Exhibits 23F, 24F). Although the scores give a sense of the claimant's mental condition, they only provide snapshots of her condition at those moments in time and do not reflect any improvement in her condition. As mentioned above, the claimant made some progress in her condition during treatment. This progress is not reflected in the GAF scores. Additionally, socioeconomic factors such as the claimant's problems with primary support issues, financial problems and occupational issues were likely considered and reflected in the rating of the scores. The [s]cores were also likely influenced by the claimant's noncompliance and alcohol use at times. Furthermore, the scores are also inconsistent with the claimant's level of daily activities as documented previously, which do not indicate that she has serious to major impairments in functioning. The clamant is able to care for herself and perform daily activities independently which included volunteer work at one point. Consequently, these scores are not accurate representations of the claimant's actual mental status.

Tr. 839–40.

In light of his assessment of Ms. Shailer-Solak's RFC, the ALJ concluded that she was

unable to perform her past relevant work as a cashier:

> Pursuant to the *Dictionary of Occupational Titles,* vocational expert Michael Dorval, testified that the claimant's past relevant work as a cashier (D.O.T. #211.462-010) is a unskilled (SVP 2) position at a light exertional level. Mr. Dorval found that given the residual functional capacity, an individual (with the same age, vocational profile, and educational level of the claimant) is unable to perform the claimant's past relevant work. Accordingly, I find that the claimant is unable to perform her past relevant work.

Tr. 841.

At Step Five, the ALJ concluded that considering Ms. Shailer-Solak's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform. Tr. 841. Specifically, he found that based on her limitations, she would be able to perform the requirements of such representative occupations as laundry worker, cleaner/janitor, and dishwasher. *Id.* The ALJ further found that in these occupations there were 1,000, 800, and 2,300 Connecticut positions, respectively, and 104,000, 75,000, and 199,000 national positions, respectively. Tr. 841–42.

Based on this analysis, the ALJ found that Ms. Shailer-Solak was not disabled in the meaning of the Social Security Act, and thus, not eligible for disability insurance benefits or supplemental security income. Tr. 842.

### 6. Appeal of Second Administrative Decision

On October 7, 2016, Ms. Shailer-Solak appealed the ALJ's August 2016 decision denying her benefits to this Court. Compl.

On June 9, 2017, Ms. Shailer-Solak moved to reverse the decision of the Acting Commissioner and/or to remand to the Acting Commissioner. Pl.'s Mot.; Pl.'s Mem.

On September 11, 2017, the Acting Commissioner moved for an order affirming her decision. Def.'s Mem.

On September 15, 2017, Ms. Shailer-Solak filed a reply to the Acting Commissioner's motion. September 15, 2017. Reply, dated Sept. 15, 2017 ("Pl.'s Reply"), ECF No. 28.

On March 19, 2019, the Court ordered the case caption be amended to reflect that Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, is now the named Defendant in this action. Order to Amend Case Caption, dated Mar. 19, 2019, ECF No. 29.

## II.     STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court reviewing a disability determination "must determine whether the Commissioner's conclusions 'are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard.'" *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)); *see also Moreau v. Berryhill*, No. 17-cv-396 (JCH), 2018 WL 1316197, at *3 (D. Conn. Mar. 14, 2018) ("Under section 405(g) of title 42 of the United States Code, it is not a function of the district court to review *de novo* the ALJ's decision as to whether the claimant was disabled. . . . Instead, the court may only set aside the ALJ's determination as to social security disability if the decision 'is based upon legal error or is not supported by substantial evidence.'") (internal citation omitted) (quoting *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)).

"Substantial evidence is 'more than a mere scintilla.'" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). "'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Moran*, 569 F.3d at 112 (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *accord Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) ("Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This is a "very deferential standard of review—even more so than the 'clearly erroneous' standard.") *Brault*, 683 F.3d at 448 (quoting *Dickson v. Zurko*, 527 U.S. 150, 153 (1999)).

## III.    DISCUSSION

Ms. Shailer-Solak's arguments essentially address one fundamental issue: whether the ALJ improperly discounted the opinions of her treating therapist, Brian Cardona. Because of this, she argues, the ALJ erred: (1) at Step Three, in finding that her combination of impairments did not equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1; (2) at Step Four, in determining her residual functional capacity for medium work; and (3) at Step Five, in applying that finding of residual functional capacity to determine there were jobs available that she could hold.

Because the Court finds that the ALJ erred in concluding that Mr. Cardona's opinions were not consistent with other substantial evidence in the record, the Court agrees.

### A.  Treating Physician Rule

With respect to the nature and severity of a claimant's impairments, "[t]he SSA recognizes a rule of deference to the medical views of a physician who is engaged in the primary treatment of a claimant." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015); *see also Burgess*, 537 F.3d at 128 (same). The treating physician's opinion "is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (citations omitted).[3]

The treating physician's opinion, however, is not afforded controlling weight where "the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam). "[T]o override the opinion of the treating physician," the ALJ must

---

[3] On March 27, 2017, new regulations took effect that effectively abolish the treating physician rule; for claims filed before March 27, 2017, however, the treating physician rule continues to apply. *See* 20 CFR § 416.927; *Smith v. Comm'r of Soc. Sec. Admin.*, 731 F. App'x 28, 30 n.1 (2d Cir. 2018).

consider, under the relevant regulations, factors including "(1) the frequently, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129).

"'An ALJ does not have to explicitly walk through these factors, so long as the Court can conclude that the ALJ applied the substance of the treating physician rule[.]'" *London v. Comm'r of Soc. Sec.*, 339 F. Supp. 3d 96, 102 (W.D.N.Y. 2018) (quoting *Scitney v. Colvin*, 41 F.Supp.3d 289, 301 (W.D.N.Y. 2014)). The ALJ "must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" *Burgess*, 537 F.3d at 129 (quoting *Halloran*, 362 F.3d at 33 and citing 20 C.F.R. § 404.1527(d)(2)).

The Appeals Council, in its remand notice, found that the ALJ's original decision had not adequately explained why he accorded little weight to treating therapist Mr. Cardona's opinion. Tr. 902. The Appeals Council therefore directed him to reassess the medical evidence in the record.

The ALJ now has fully articulated his reasons for assigning that opinion little weight, explaining that Mr. Cardona's opinions[4] were, generally speaking, not entitled to much weight because they were overstatements of Ms. Shailer-Solak's limitations and not supported by the medical evidence. Tr. 839. He noted, in particular, that notes from Ms. Shailer-Solak's treating providers at InterComm of "individual therapy and medication management sessions document the claimant's reports of volunteer and work activity and social activities with friends or

---

[4] The parties do not appear to dispute that Mr. Cardona's opinions were made by a "treating source" for purposes of the rule, insofar as they were co-signed by acceptable physicians. The December 18, 2013 opinion was co-signed by Dr. Anees Ahmed, Plaintiff's psychiatrist. Tr. 714. The December 15, 2015 opinion was co-signed by Nurse Practitioner Carol Montano. Tr. 1150.

neighbors," finding that "[t]hese activities do not support the marked/extreme restrictions, serious limitations or inability to meet competitive standards found by" Mr. Cardona. Tr. 839. Finally, the ALJ explained that Mr. Cardona's opinions did not indicate whether the stated limitations were a result of noncompliance. *Id.*

Ms. Shailer-Solak contends that the ALJ ignored the Appeals Council's directives and "cherry-picked" the evidence in the record to support his decision not to give Mr. Cardona's opinions controlling weight. *See* Pl.'s Mem. at 4–11; Pl.'s Reply at 4 ("In sum, without using the phrase, the Appeals Council truly understood the cherry-picking that was rampant in the first Decision, cherry-picking that is carried forward in the current Decision and in the Defendant Commissioner's memo.").

The Court agrees.

In *Rosa,* the Second Circuit concluded that the ALJ, as a lay person, "simply was not in a position to know whether the absence of muscle spasms would in fact preclude the disabling loss of motion described by Dr. Ergas in his assessment." *Rosa,* 168 F.3d at 79. By doing so, the ALJ had impermissibly substituted his own judgment for competent medical opinion. *Id.*; *see also Thornton v. Colvin*, No. 3:13-CV-1558 (CSH), 2016 WL 525994, at *7 (D. Conn. Feb. 9, 2016) ("In the case at bar, the ALJ decided to disregard a treating physician's medical opinion that Thornton was disabled because, in the ALJ's lay view, the medical records did not support that medical opinion. This runs counter to Second Circuit authority, which disapproves of a non-physician ALJ substituting his or her lay judgment, based upon such a circumstantial critique, for competent medical opinion.").

The ALJ here, nevertheless, has substituted his own judgment for competent medical opinion.[5]

On the issue of noncompliance, the ALJ stated that "even though Mr. Cardona's opinion was co-signed by an acceptable medical source, Dr. Ahmed, it is not very persuasive because it does not indicate whether these limitations are a result of the claimant's noncompliance." Tr. 839. But the record evidence does not support this conclusion. Ms. Shailer-Solak reported high levels of stress, anxiety, and depression, regardless of whether she was compliant with her medication requirements. *Compare, e.g.*, Tr. 1119 (noting in "Progress in last Quarter" section, in an opinion cosigned by Dr. Ahmed, that "Client continues to take medication, but also reporting in the Justification for Ongoing Care section that "Stress and anxiety has been at a level of 9 out of 10. Depression has been at a level of 9 out of 10."); *with* Tr. 1123 (noting compliance issues, in an opinion cosigned by Dr. Ahmed, but still reporting "[a]nxiety and depression has been at a level of 9 out of 10 and has been occurring daily.").

Likewise, the ALJ's lay assessment of certain "volunteer and work activity and social activities with friends or neighbors" is not a sufficient basis to ignore a treating physician's medical assessment of Ms. Shailer-Solak's marked/extreme restrictions, serious limitations, and

_____

[5] He also may have not followed the specific directives of the Appeals Council's remand order, which is in and of itself legal error. *See Ellis v. Colvin*, 29 F. Supp. 3d 288, 299 (W.D.N.Y. 2014) ("The regulations clearly state that an 'administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order.' The failure of an ALJ to abide by the directives in an Appeals Council remand order constitutes legal error requiring remand.") (quoting 20 C.F.R. § 404.977(b)) (citations omitted); *Cabibi v. Colvin*, 50 F. Supp. 3d 213, 231 (E.D.N.Y. 2014) (finding remand appropriate where ALJ failed to develop record in compliance with Appeals Council's remand order and collecting cases); *Savino v. Astrue*, No. 07-cv-4233 (DLI), 2009 WL 2045397, at *9 (E.D.N.Y. Jul. 8, 2009) ("An ALJ commits legal error requiring remand when he does not abide by a remand order from the Appeals Council.") (citations omitted); *Mann v. Chater*, No. 95 CIV. 2997 (SS), 1997 WL 363592, at *3 (S.D.N.Y. Jun. 30, 1997) ("The ALJ should have followed the order of the Appeals Council. Because he did not, I must remand this action.") (citing 20 C.F.R. § 404.977(b)); *see also* Tr. 851 ("I also have the prior decisions in your case from both here at the hearing level, my decision, and also the Appeals Council decisions and the U.S. District Court remand and subsequent Appeals Council remand and I have read all of those prior decisions in your case. I am not bound by any prior decisions in your case.").

inability to meet competitive standards found by Mr. Cardona and endorsed by Dr. Ahmed. *See Rosa*, 168 F.3d at 79; *see also Thornton*, 2016 WL 525994, at *7. Indeed, the Appeals Council had already concluded that the ALJ's first "decision inaccurately relies on volunteer and part-time work that appears to show the claimant cannot function in a regular work environment[.]" Tr. 902.

The ALJ also highlighted inconsistencies between the treating physicians and the mental status examinations. Tr. 839. The ALJ generally determined that the consultative examiners decisions were entitled to greater weight because they were "generally consistent with the claimant's mental status examinations over time" and "with the improvement of the claimant's condition with medication and the use of coping mechanisms." Tr. 840. He also afforded "some weight" to state agency consultants, even though they had only seen Ms. Shailer-Solak briefly, and several years before. *Id.*

But Dr. Kahn, Ms. Reese, Dr. Hernández, as well as the state agency examiners, met with Ms. Shailer-Solak briefly, only for the purposes of the examination. Meanwhile, the providers at InterComm have been treating and providing services to Ms. Shailer-Solak for nearly ten years at this point and, at the time the ALJ issued his ruling, had treated Ms. Shailer-Solak for more than four years following the intervention of the non-treating examiners. *See* Tr. 335 (noting start of treatment at InterComm. on February 20, 2008). The Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013).

Significantly, Dr. Kahn's determination and the Reese/Hernández report are not actually inconsistent with the InterComm reports. As the Appeals Council noted in its remand of the ALJ's first decision, both "include statements that tend to show greater limitations" than the ALJ

understood them to say—specifically noting Dr. Kahn's statement that Ms. Shailer-Solak "is still quite symptomatic" and "still gets several panic attacks a week." Tr. 902. In his second decision, however, the ALJ did not address these statements by Dr. Kahn or Ms. Reese.

Finally, other record evidence supports Mr. Cardona's report. For example, the Appeals Council noted that the original decision "does not evaluate the numerous low GAF scores in the record that support the opinion . . . ." Tr. 902. On remand, the ALJ concluded that he should "afford little weight to the claimant's GAF scores below 50, ranging as low as 32" because they "only provide snapshots of her condition at those moments in time and do not reflect any improvement in her treatment." Tr. 840. He repeated his conclusion that the "the claimant made some progress in her condition during treatment" and that any progress "was not reflected in the GAF scores." Tr. 840.

While GAF scores are no longer included in the *Diagnostic and Statistical Manual of Mental Disorders*, and the Social Security Administration limits their use, these scores are still useful, however, "as opinion evidence, i.e., the details of the clinician's description rather than a numerical range." *Packard v. Berryhill,* No. 16-cv-00560V (F), 2018 WL 3651330, at *7 (W.D.N.Y. Aug. 1, 2018); *see Martin v. Berryhill*, No. 17-CV-00267-LGF, 2018 WL 3439867, at *5 (W.D.N.Y. July 17, 2018).

Here, the GAF scores directly contradict the ALJ's assessment. Rather than show progress, the scores consistently place Ms. Shailer-Solak between 30 and 40 within the two years prior to the ALJ's second decision, providing a longer view of her condition. *See* Pl.'s Mem. at 21–22 (collecting scores), Significantly, consistent scores under 50 "indicate[] serious symptoms or a serious impairment in social or occupational function." *Concepcion v. Astrue*, No. 3:09-CV-01376 (SRU) (WIG), 2010 WL 2723184, at *7 (D. Conn. July 8, 2010); *accord. Pulvino v.*

*Berryhill,* No. 17-cv-6507 (JWF), 2018 WL 3575315, at *2 (W.D.N.Y. July 24, 2018) (noting GAF scores of 45 and 55 as "indicat[ing] serious limitations in functioning" and supporting treating physician's opinion).

For these reasons, the Court finds that the ALJ erred in affording Mr. Cardona's 2013 and 2015 assessments little weight.

### B. Step Three

Ms. Shailer-Solak argues that because the ALJ declined to defer to Mr. Cardona's opinion he erroneously concluded that her impairments—bipolar disorder, affective disorder, and post-traumatic stress disorder—did not meet, singly or collectively, listing-level severity for these impairments. Pl.'s Mem. at 31.

The Court agrees.

"For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (citation omitted). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Id.* at 531 (footnote and citation omitted).

The ALJ examined the criteria of Listings 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.08 (personality and impulse-control disorders).[6] On appeal, Ms. Shailer-Solak does not challenge the ALJ's conclusions with respect to listing level 12.08.

_____

[6] The ALJ also noted Listing 12.09 (substance addition disorders) but concluded that it need not be investigated further because the medical evidence neither showed that it resulted in more than moderate difficulties functioning

"To qualify as a listed impairment under Listing 12.04, the claimant's impairment must satisfy the criteria in both paragraphs A and B, or the criteria in paragraph C, of that listing. To qualify as a listed impairment under Listing 12.06, the claimant's impairment must satisfy the criteria in both paragraphs A and B, or the criteria in both paragraphs A and C, of that listing." *Avila v. Astrue*, 933 F. Supp. 2d 640, 651 (S.D.N.Y. 2013) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 and 12.06).

### 1. Paragraph B Criteria

Both listings have identical paragraph B criteria. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 ¶ B; *id.* at § 12.06 ¶ B; *Vassar v. Comm'r of Soc. Sec.*, No. 8:14-CV-0977 (GTS), 2015 WL 4651050, at *4 (N.D.N.Y. Aug. 5, 2015) ("Both Listings §§ 12.04 and 12.06 have identical paragraph B criteria.").

To satisfy those criteria, the mental impairments "must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." Tr. 829. "A marked limitation means more than moderate but less than extreme." *Id.* "Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least two weeks."

Both the 2013 and 2015 Mental Impairment Questionnaires completed by Mr. Cardona (and co-signed by Dr. Ahmed and Nurse Montano, respectively) found that Ms. Shailer-Solak's impairments resulted in an extreme restriction of activities of daily living, marked difficulties in

---

or that it exacerbated Ms. Shailer-Solak's depressive or anxiety symptoms to a level warranting a disability addiction or alcoholism ("DAA") analysis. Tr. 829 n.1; *see also* Public Law 104-121 and Section 223(d)(2)(C) and 1614(a)(3)(J) of the Social Security Act as amended; DI 90070.050 (Adjudicating a Claim Involving Drug Addition or Alcoholism (DAA), PROGRAM OPERATIONS MANUAL SYSTEM, https://secure.ssa.gov/poms.nsf/lnx/0490070050.

maintaining social functioning, extreme difficulties in maintaining concentration, persistence, or pace, and four or more episodes of decompensation within a twelve-month period, each lasting at least two weeks. Tr. 713, 1149. In both questionnaires, Mr. Cardona indicated that Ms. Shailer-Solak had a "current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement" and "an anxiety related disorder and complete inability to function independently outside the area of one's home." Tr. 713, 1149.

The ALJ disagreed with these findings and concluded that Ms. Shailer-Solak only had a mild restriction of activities of daily living, Tr. 829, moderate difficulties in social functioning, Tr. 829–30, and moderate difficulties in maintaining concentration, persistence, or pace, Tr. 830. The ALJ also found that Ms. Shailer-Solak has not experienced any episodes of decompensation for an extended duration. Tr. 830.

With respect to Ms. Shailer-Solak's activities of daily living, the ALJ found her restriction only mild, based primarily on three reports in the record.

First, in December 4, 2011, Ms. Shailer-Solak reported that she spent a lot of time out walking with her dog, that she had no problems dressing or grooming, that she prepared her own meals, shopped for food in stores, went out of her house regularly for fresh air and sunshine, and volunteered at Human Services and Kiwanis, Tr. 829 (citing Dec. 4, 2011 Activities of Daily Living Report, Tr. 271–78).

Second, the ALJ noted that on February 7, 2012, Ms. Reese found that Ms. Shailer-Solak likes to "read, listen to music, walk and sit on her deck to watch the animals, go to listen to free music on Wednesday nights and attends church on Sundays. With regard to completing daily activities, she asserted that she is independent and self-motivated. She can do her own grooming,

cleaning, shopping, and cooking." Tr. 829 (citing Feb. 7, 2012 Mental Status Assessment, Tr. 622–27).

Third, the ALJ highlighted that, on July 20, 2012, Ms. Shailer-Solak "reported hanging out in the pool in warmer weather." Tr. 829 (citing Disability Evaluation, Tr. 632–34). In addition, the ALJ noted that treatment records indicate "consistent reports of part-time work activity during the relevant period." Tr. 829.

Later in the opinion, the ALJ reviewed the InterComm treatment notes in detail. Tr. 834–38. Among the relevant findings in his analysis of these notes were that: (1) in a December 2012 medication management session with Dr. Ahmed, Ms. Shailer-Solak reported volunteering her time at Foodshare and helping poor people," Tr. 835 (citing Medication Progress Note, dated Dec. 12, 2012, Tr. 742); (2) on December 28, 2012, Ms. Shailer-Solak reported to Intercomm staff member Lindsay Green that she had been "consistently volunteering at the Newington Town Social Services Department, Tr. 835 (citing ISP Coordination Form 1.2, dated Dec. 28, 2012, Tr. 747); (3) in an October 2, 2013 session with Mr. Cardona, Ms. Shailer-Solak reported volunteering time at town hall one to two times a week, Tr. 836 (citing ISP Coordination Form 1.3, dated Oct. 2, 2013, Tr. 796); and (4) in the October 2, 2013 session with Mr. Cardona, Mr. Cardona rated Ms. Shailer-Solak's "health practices, housing stability, time management, nutrition, personal hygiene, grooming and dress" within "normal limits," determined that she had only "moderate problems" with "communication, safety, managing money, leisure, community resources, sexuality, productivity, and behavior norms," determined that she had only "occasional, moderately severe problems" with "problem solving, social network, and coping skills," and determined that she had "severe problems with family relationships and alcohol/drug use," Tr. 836 (citing ISP Coordination Form 1.3, dated Oct. 2, 2013, Tr. 798–99).

With respect to Ms. Shailer-Solak's social functioning, the ALJ found her to have moderate difficulties. He cited several pieces of evidence, including: (1) in December 4, 2011, Ms. Shailer-Solak reported that she tried to socialize daily by having conversations or just listening, and had volunteered at Human Services and Kiwanis, Tr. 829 (citing Dec. 4, 2011 Activities of Daily Living Report, Tr. 271–78); (2) on February 7, 2012, she reported to non-treating LCSW Diane Reese that she is able to take public transit without assistance, is sociable, and able to communicate well with others, Tr. 829–30 (citing Feb. 7, 2012 Mental Status Assessment, Tr. 622–27); (3) that her evaluator Margarita Hernandez on February 7, 2012 found her to be alert, cooperative, and friendly, and that she made regular eye contact, was relaxed, and had normal speech and easy rapport, Tr. 830 (citing Feb. 7, 2012 Mental Status Assessment, Tr. 622–27; (4) that at a July 20, 2012 examination with Dr. Steven Kahn of Connecticut Disability Determination Services, Ms. Shailer-Solak reported having little social contact with family or any friends, Tr. 830 (citing Tr. 632–34); and (5) that her mental status examinations, as documented in progress notes from InterComm, showed that she generally had depressed/anxious mood with congruent affect, but also showed that her symptoms were generally moderate, Tr. 830 (citing Tr. 1000–1143).

With respect to Ms. Shailer-Solak's concentration, persistence, or pace, the ALJ found her to have only moderate difficulties. He noted that Ms. Shailer-Solak has (1) been able to provide detailed work history and account of her daily activities, Tr. 830 (citing Dec. 4, 2011 Activities of Daily Living Report, Tr. 271–78); and (2) been able to provide detailed family and medical histories to multiple examining and treating providers, Tr. 830 (citing Wheeler Clinic Treatment Records, Tr. 334–429; Progress Notes from Hospital of Central Connecticut, Tr. 450–

507; InterComm Adult Assessment, Tr. 574–605; Feb. 7, 2012 Mental Status Assessment, Tr. 622–27; and Disability Evaluation, Tr. 632–34).

With respect to the episodes of decompensation, the ALJ concluded that Ms. Shailer-Solak has experienced no episodes of decompensation of extended duration. Tr. 830. He found a general absence of "medical evidence of exacerbations or temporary increases in the claimant's symptoms or signs, accompanied by a loss of adaptive function," as well as no "significant alteration in medication" or "need for a more structured psychological support system." Tr. 830.

As discussed above, the ALJ erred in finding that Mr. Cardona's opinions in the Impairment Questionnaires dated December 18, 2013 and December 15, 2015 were not consistent with the other medical evidence in the record and this error similarly affects the ALJ's analysis with respect to the first three paragraph B criteria.

Indeed, with respect to episodes of decompensation, the ALJ did not account for Mr. Cardona's view—that Ms. Shailer-Solak had experienced four or more such episodes within a twelve-month period, Tr. 1149.

### 2. **Paragraph C Criteria**

"To satisfy the paragraph C criteria of Listing § 12.04, the mental impairment must have existed for at least two years and cause more than a minimal limitation on plaintiff's ability to perform basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: 1) repeated episodes of decompensation, each of extended duration; or, 2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or, 3) current history of one or more years inability to function outside a highly supportive living arrangement, with an indication of

36

continued need for such an arrangement." *Vassar*, 2015 WL 4651050, at *4 (citing 20 C.F.R. Part 404, Subpart P, App'x 1).

"To satisfy the paragraph C criteria of Listing § 12.06, the mental impairment must result in a complete inability to function independently outside the area of one's home." *Id.* (citing 20 C.F.R. Part 404, Subpart P, App'x 1).

On his 2013 and 2015 questionnaires, Mr. Cardona determined that Ms. Shailer-Solak had a chronic affective disorder, causing more than a minimal limitation to do any basic work activity, with a current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of such arrangement, and an anxiety related disorder and complete inability to function independently outside the area of her home. Tr. 713, 1149.

With respect to Listing § 12.04, the ALJ determined that Ms. Shailer-Solak's medical records "show no evidence" of a "chronic affective disorder of at least 2 years duration that caused more than a minimal limitation of ability to do basic work activities," and that while Ms. Shailer-Solak "has been diagnosed with depression, she has not experienced repeated episodes of decompensation, a residual disease process resulting in marginal adjustment that a minimal increase in mental demands or change in environment that would cause decompensation, or a current history or 1 or more years' inability to function outside of a highly supportive living environment." Tr. 831.

With respect to Listing § 12.06, the ALJ noted that Ms. Shailer-Solak "reported that she is able to care for herself and her household independently," and that she "is able to leave her home to shop and attend her medical appointments." Tr. 831. The ALJ therefore found that Ms. Shailer-Solak had the capacity to function independently outside the area of her home.

As also discussed above, the ALJ, however, gave too little weight to Mr. Cardona's opinion in his evaluation of Listing § 12.06's paragraph C criteria, given the abundant medical and other evidence in the record that Ms. Shailer-Solak could not function outside of her home. In Mr. Cardona's opinion, approved by Dr. Ahmed, with respect to Listing 12.04's paragraph C criteria, Ms. Shailer-Solak had a current history of one or more years' inability to function outside of a highly supportive living environment.

The ALJ did not identify specific evidence contradicting Mr. Cardona's conclusion that Ms. Shailer-Solak has a chronic affective disorder that caused more than a minimal limitation of ability to do basic work activities, report of repeated episodes of decompensation, nor does he appear to have identified specific evidence that she does not have a chronic affective disorder. He simply found a lack of evidence as to such a disorder or such episodes.

The ALJ's conclusion as to the lack of a chronic affective disorder thus is erroneous. As discussed above, at Step Two, the ALJ found that Ms. Shailer-Solak had a severe impairment, an affective disorder. *See Griffiths v. Astrue*, No. 1:09CV2453, 2011 WL 53096, at *4 (N.D. Ohio Jan. 7, 2011) ("The Court finds that Plaintiff's quoted part of the ALJ's Step 3 finding would be inconsistent with the ALJ's Step 2 finding because the ALJ's phrase 'no more than a minimal limitation' implies that no severe impairment exists.") (citations omitted).

Moreover, in evaluating the paragraph B criteria, the ALJ concluded that Ms. Shailer-Solak had moderate difficulties in social functioning and maintaining concentration, persistence, and pace. These findings would suggest that Ms. Shailer-Solak's disorder has caused "more than a minimal limitation of ability to do basic work activities," as required to satisfy the first prong of paragraph C.

Indeed, the 2013 Mental Impairment Questionnaire, prepared by Mr. Cardona and approved by Dr. Ahmed, listed as extreme Ms. Shailer-Solak's restriction of activities of daily living, as well as her difficulties in maintain concentration, persistence or pace and as marked, her difficulties in maintaining social functioning. Tr. 71. It further listed that Ms. Shailer-Solak suffered four or more episodes of decompensation within a twelve-month period, each of which was at least two weeks in duration. *Id.* The 2015 Mental Impairment Questionnaire, completed nearly two years later, details the same limitations. *Id.* at 1149.

Thus, Ms. Shailer-Solak has provided evidence in the record of decompensation that would provide a basis for finding that she satisfies the paragraph C criteria. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987) ("The claimant first must bear the burden at step one of showing that he is not working, at step two that he has a medically severe impairment or combination of impairments, and at step four that the impairment prevents him from performing his past work . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.").

By substituting his lay judgment for competent medical opinion, the ALJ's decision not to credit Mr. Cardona's assessments with respect to the paragraph C criteria was erroneous

Accordingly, the Court finds error in the ALJ's Step Three determination. If the ALJ had given Mr. Cardona's assessments—assessments supported by substantial evidence in the record—controlling weight, a finding that Ms. Shailer-Solak was disabled would have been required here.

### C. Step Four

Ms. Shailer-Solak argues the ALJ erred at Step Four in determining her residential functional capacity for medium work, with the additional limitation that she is able to carry out

and remember simple instructions in a workplace environment with few changes, occasional interactions with coworkers and none with the public. Pl.'s Mem. at 31–35. She contends that the ALJ failed to properly credit Mr. Cardona's assessments of her "as 'seriously limited' in virtually every subcategory of mental abilities[.]" *Id.* at 33 (citing Tr. 711, 1147).

The Court agrees.

A claimant's residual functional capacity ("RFC") "is 'the most [he or she] can still do despite [his or her] limitations.'" *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting 20 C.F.R. § 416.945(a)(1)). "When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id.* (citations omitted).

"The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). If such an impairment is identified, "at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)). The ALJ must consider statements the claimant or others make about her impairments, her restrictions, her daily activities, her efforts to work, or any other relevant statements she makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in administrative

proceedings. *Id.* (quoting 20 C.F.R. § 404.1512(b)(3) and citing 20 C.F.R. § 404.1529(a); S.S.R. 96–7p.).

Here, at the first step, the ALJ found Ms. Shailer-Solak's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." Tr. 838. At the second step, however, the ALJ concluded that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.* In particular, the ALJ noted that Ms. Shailer-Solak generally had seen improved memory with treatment, and that she was "cognitively intact with a logical thought process, no abnormal thoughts and full orientation." He further noted that all abnormalities of mood and affect were consistently described in treatment notes as moderate.

Having afforded Mr. Cardona's opinion little weight, the ALJ considered the medical opinions of Dr. Ann Price and Dr. Erol, Tr. 839, but also afforded them limited weight. *Id.*

The ALJ next turned to Plaintiff's GAF scores, but concluded that he should "afford little weight to the claimant's GAF scores below 50, ranging as low as 32" because they "only provide snapshots of her condition at those moments in time and do not reflect any improvement in her treatment." Tr. 839–40. He repeated his conclusion that "the claimant made some progress in her condition" but that this "was not reflected in the GAF scores." Tr. 840.

Finally, the ALJ noted the findings of non-treating examiners Dr. Khan and Dr. Hernandez, and afforded them "greater weight" than Mr. Cardona's opinions. The ALJ found these opinions to be "consistent with the claimant's mental status examination over the course of her treatment" and "with the claimant's level of daily activities which involv[e] caring for herself and helping others through volunteer work." Tr. 840. He also noted the opinions of the state

agency consultants that Ms. Shailer-Solak "had difficulties in social functioning that limit the frequency of her interactions." *Id.* While he assigned these opinions some weight, he noted that treatment notes later submitted, and not considered by the consultants, showed Ms. Shailer-Solak had "experienced difficulty in her ability to concentrate and with her memory at times." *Id.* He therefore found Ms. Shailer-Solak subject to the limitation of carrying out and remembering simple instructions. *Id.*

Based on all of this, the ALJ concluded that

> Notwithstanding her noncompliance with follow-up and her medications, the claimant was able to work part-time for long stretches during the relevant period and also engage in volunteer work. Her noncompliance usually coincides with her mood lability and memory problems, both of which improve as she becomes more compliant. Her more recent treatment notes demonstrate that she learned helpful coping mechanisms deal with her symptoms and that her symptoms also improved with medications. She testified that she was experiencing one of her daily panic attacks during the hearing, but she was still able to answer questions and respond appropriately. Although her demeanor limits her social interactions in some capacity, it does not preclude all work related activity. Her mental status examinations also show positive findings of mood, affect, concentration and memory abnormalities at times. I have accounted for the foregoing and find that the claimant is limited to carrying out and remembering simple instructions, in an workplace environment with few changes, occasional interactions with coworkers and none with the public.

Tr. 838.

Plaintiff argues that the ALJ should have deferred to Mr. Cardona at the second step. Mr. Cardona had identified that, with respect to most mental abilities needed to do unskilled work, Ms. Shailer-Solak was "seriously limited," except for her ability to understand and remember very short and simple instructions, which he rated as "limited but satisfactory." Tr. 711. In three abilities—working in coordination with or proximity to others without being unduly distracted, performing at a consistent pace without an unreasonable number and length of rest periods, and

responding appropriately to changes in a routine work setting—Mr. Cardona found that Ms. Shailer-Solak was "unable to meet competitive standards." *Id.* With respect to abilities to do particular types of jobs, Mr. Cardona found Ms. Shailer-Solak seriously limited in her ability to travel to unfamiliar places and use public transportation, but otherwise "limited but satisfactory" in her ability to interact appropriately with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. Tr. 712.

Again, as already discussed above, the ALJ erred in giving too little weight to the opinions of Mr. Cardona. The ALJ's lay judgment about the significance of reports of volunteer and work activity and social activities with friends and neighbors and other matters cannot be a substitute for competent medical opinion regarding Ms. Shailer-Solak's limitations arising from her medical condition, particularly when two separate Mental Impairment Questionnaires issued two years apart find similar, if not the same, extreme and marked limitations in Ms. Shailer-Solak's functioning capacity. *See* Tr. 713, 1149 (similarly finding extreme limitations in the restriction of activities of daily living, and in maintaining concentration, persistence, or pace and marked limitation in social functioning, as well as several episodes of decompensation a year lasting more than two weeks in duration). Moreover, these medical records are not in isolation, but supplemented by numerous notations related to PTSD, and various symptoms of stress, anxiety and depression during this same time period. *See, e.g.,* Tr. 1119 (noting "[s]tress and anxiety has been at a level of 9 out of 10. Depression has been at a level of 9 out of 10."); Tr. 1123 (noting "[a]nxiety and depression has been at a level of 9 out of 10 and has been occurring daily.").

As noted earlier, GAF scores are no longer included in the *Diagnostic and Statistical Manual of Mental Disorders*, and the Social Security Administration limits their use. *See Martin*

2018 WL 3439867, at *5. But the scores are still useful "as opinion evidence, i.e., the details of the clinician's description rather than a numerical range." *Packard*, 2018 WL 3651330, at *7.

Again, as already discussed above, Ms. Shailer-Solak's GAF scores contradicted the ALJ's assessment, consistently placing her between 30 and 40 within the two years prior to the ALJ's second decision. *See* Pl.'s Mem. at 21–22 (collecting scores). These provide multiple snapshots over time, and consistent scores under 50 "indicat[] serious symptoms or a serious impairment in social or occupational function." *Concepcion v. Astrue*, No. 3:09-cv-1376 (SRU) (WIG), 2010 WL 2723184, at *7 (D. Conn. July 8, 2010); *accord. Pulvino v. Berryhill,* No. 17-cv-6507 (JWF), 2018 WL 3575315, at *2 (W.D.N.Y. July 24, 2018) (noting GAF scores of 45 and 55 as "indicat[ing] serious limitations in functioning" and supporting treating physician's opinion). While the ALJ concluded that the scores were "inconsistent with the claimant's level of daily activities and documented previously, which do not indicate that she has serious to major impairments in functioning," once again, the ALJ's lay judgment should not have been substituted for competent medical opinion.

The ALJ thus erred in substituting his lay judgment for that of competent medical opinion in finding that Mr. Cardona's opinions in the Impairment Questionnaires dated December 18, 2013 and December 15, 2015 were not consistent with the other medical evidence in the record with respect to Ms. Shailer-Solak's residual functional capacity.

Accordingly, the ALJ erred in his residual functional capacity determination at Step Four.

### D.  Step Five

Ms. Shailer-Solak argues that because the ALJ did not properly determine her residual functional capacity at Step Four, his conclusion about the jobs that would be available to her at Step Five is not supported by substantial evidence. Pl.'s Mem. at 34 ("In the absence of an

accurate RFC in the hypothetical posed to the [Vocational Expert], the [Acting] Commissioner has failed to carry her burden of proof of 'no disability' at Step 5, leaving the conclusion that the claimant is disabled.").

Because the Court has found that the ALJ's determination of Ms. Shailer-Solak's residual functional capacity was not supported by substantial evidence in the record, the Court agrees.

Ms. Shailer-Solak additionally argues that the ALJ failed to address the additional assumptions raised in his hypothetical questions to the vocational expert.

At the fifth step, the ALJ considers the claimant's "residual functional capacity and [ ] age, education, and work experience" to evaluate whether the claimant "can make an adjustment to other work." 20 C.F.R. § 416.920(a)(4)(v). If the claimant is able to adjust to other work, then the ALJ will find the person not disabled; if the claimant cannot make the adjustment, the ALJ will find the person disabled. *Id.* While the claimant bears the burden for the first four steps of the disability determination, the burden shifts at Step Five. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

An ALJ may determine if there are a significant number of jobs available to a claimant either by applying the Medical Vocational Guidelines or by relying on the testimony of a vocational expert. *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014). Furthermore, "[a]n ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion,' . . . and accurately reflect[s] the limitations and capabilities of the claimant involved[.]" *Id.* (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983) and citing *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)); *see also McAuliffe v. Barnhart,* 571 F. Supp. 2d 400, 406 (W.D.N.Y. 2008) ("I find, however, that because the hypothetical question

posed to the vocational expert was not based on an accurate portrayal of plaintiff's impairments, the ALJ committed error in posing the hypothetical, and in relying on the vocational expert's answer to the hypothetical."); *Pardee v. Astrue*, 631 F. Supp. 2d 200, 222 (N.D.N.Y. 2009) ("Use of hypothetical questions to develop the vocational expert's testimony is also permitted, provided that the questioning precisely and comprehensively includes each physical and mental impairment of the claimant accepted as true by the ALJ.").

Because the ALJ had previously determined at Step Four that Ms. Shailer-Solak could not perform the full range of medium work, the ALJ relied on the testimony of Michael Dorval, a vocational expert, to determine "the extent to which [Ms. Shailer-Solak's additional limitations] erode the unskilled medium occupational base[.]" *See* Tr. 841. Based on that testimony, the ALJ first asked a hypothetical question:

> First, assuming someone of the same age, education, and work experience as the claimant. If the person could do medium work, as defined. They could carry out and remember simple instructions in a workplace with few changes. They could have occasional interaction with coworkers, but no interaction with the general public. Under that hypothetical could such a person do any of the claimant's past work?

Tr. 864. Mr. Dorval responded such a person could not do Ms. Shailer-Solak's past work because it "involves public contact." *Id.* The ALJ then asked if there were other jobs in the national economy that "such a person could do." *Id.* Mr. Dorval responded that a similarly-situated claimant could be a laundry worker, cleaner/janitor, and a dishwasher. *Id.*

The ALJ relied on this testimony in his final decision, concluding that "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Tr. 842.

During the hearing, however, the ALJ posed two further hypotheticals that have bearing on whether there are adequate positions existing in the national economy for someone similarly-situated to Ms. Shailer-Solak. First, he asked if there was an opportunity for employment for someone who "would be off task at least 15% or more of the workday." Tr. 865. Mr. Dorval stated that there were no full-time jobs for such a person. *Id.* Second, the ALJ asked if there would be work for an employee who would be "absent two or more times a month." *Id.* Again, Mr. Dorval stated that there were no full-time jobs available for such a person. *Id.* The ALJ, however, did not address these two hypotheticals in his decision.

Ms. Shailer-Solak contends this was error. She points to one district court that has found error where an ALJ failed to explain the reasons for not crediting the answers to these additional hypothetical questions. *White v. Colvin*, No. CIV.A. 13-3991 MCA, 2015 WL 1523068, at *5 (D.N.J. Apr. 2, 2015) ("By virtue of propounding such pointed hypothetical questions, the ALJ acknowledged evidence might suggest that Plaintiff could only concentrate for six out of eight hours per workday, that he would miss work twice per month, or that he was unable to have any contact with supervisors."). In that case, however, that ALJ "did not address the contrary medical evidence that supports a finding that the Plaintiff suffered" from the limitations posed in the hypotheticals. *Id.* That ALJ's error was not failing to deal with the hypotheticals, but failing to deal with contrary medical evidence suggesting additional limitations. *Id.* ("By failing to address the contrary evidence in her opinion, this Court cannot determine whether the ALJ rejected this evidence or simply failed to consider it.").

In any event, the first hypothetical question "to the vocational expert was not based on an accurate portrayal of plaintiff's impairments" and therefore "the ALJ committed error in posing the hypothetical, and in relying on the vocational expert's answer to the hypothetical." *McAuliffe*,

571 F. Supp. at 406; *see also Aubeuf v. Schweiker*, 649 F.2d 107, 114–15 (2d Cir. 1981) (overturning and remanding where hypothetical assumed plaintiff could walk, an assumption challenged by other record evidence). An accurate portrayal of Ms. Shailer-Solak's impairments would take into consideration the record evidence of her repeated flashbacks, panic attacks, and other mental health concerns which result in her being significantly distracted in her work or require frequent absences.

In both of Ms. Shailer-Solak's Mental Impairment Questionnaires, and as recognized in the parties' stipulated facts, Mr. Cardona determined that Ms. Shailer-Solak would be absent from work over four days per month. Tr. 749, 1150. At Step Three, the ALJ improperly concluded that this opinion was not entitled to controlling weight as to the severity of Ms. Shailer-Solak's impairments. As addressed above, he concluded that Mr. Cardona's determination was inconsistent with the record as a whole, and as the Court has determined, the ALJ's conclusions were in error. But even if that were correct, the ALJ has pointed to no reason why Mr. Cardona's assessment of Ms. Shailer-Solak's future absences themselves would be inconsistent with any other piece of evidence in the record. *Cf. Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (noting, regarding treating providers opinions, "the less consistent that [an] opinion is with the record as a whole, the less weight it will be given.").

Put another way: even assuming there were some inconsistency in the record regarding Ms. Shailer-Solak's ability to concentrate and thus be determined disabled at Step Three, the non-treating examiners' evidence that the ALJ relied on at Step Three would also support a finding that she would be regularly absent from her place of work at Step Five.

Dr. Kahn—whose opinion the ALJ "afford[ed] greater weight," Tr. 840—concluded that Ms. Shailer-Solak was "still quite symptomatic" in 2012, and that she suffered from "panic

disorder with a degree of agoraphobia and she still gets several panic attacks a week and also a PTSD which manifest [sic] itself at least partially in terms of occasional flashbacks and bad dreams." Tr. 634. Similarly, Ms. Reese noted that "Ms. Shailer-Solak spoke of having startled responses to common things such as a phone ringing or someone raising hand." Tr. 626.; *see also* Tr. 627 ("When these feelings become so intense she often seeks help by going to the emergency room for a crisis evaluation and possible admission to a psychiatric unit."). These conclusions are consistent with a finding that Ms. Shailer-Solak would be absent regularly from her place of work, a possibility not included in the first hypothetical posed to the vocational expert.

In fact, the ALJ appeared to recognize these limitations by posing the second and third hypotheticals. The ALJ, however, did not address these two hypotheticals in his decision.

As a result, the ALJ erred by relying on a hypothetical that was not supported by substantial evidence and did not accurately reflect Ms. Shailer-Solak's limitations and capacities. *Accord McAuliffe,* 571 F. Supp. 2d at 406–07 (remanding for calculation of benefits where hypothetical wrongly presumed plaintiff could read "any particular sized font over a sustained period of time."); *Mathews v. Barnhart*, 220 F. Supp. 2d 171, 175–76 (W.D.N.Y. 2002) (remanding because "[a]s the vocational expert was not able to consider all of the plaintiff's psychological deficiencies before making his determination, I find that his testimony that the plaintiff could perform the jobs of information clerk or surveillance system monitor technician is not substantial evidence on which an ALJ may make a finding of non-disability.").

Accordingly, the ALJ erred at Step Five.

### E.    Issue of Remand

Given the record as a whole and the deficiencies in the ALJ's decision identified above, rehearing is not warranted, and instead, this case will be remanded solely for the calculation and payment of benefits.

As the Second Circuit has noted, "[w]here application of the correct legal standard could lead to only one conclusion, we need not remand." *Schaal v. Apfel*, 134 F.3d at 504; *see also Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980) ("[W]e have reversed and ordered that benefits be paid when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose."). Given the Court's determination regarding Step Five, only one outcome is possible: the "record is clear that if the opinion of plaintiff's treating physician controls, there are no jobs in the national economy that plaintiff can perform." *Morris v. Berryhill*, 313 F. Supp. 3d 435, 441(W.D.N.Y. 2018). "As such, additional proceedings would serve no proper purpose, and remand for the calculation and payment of benefits is warranted." *Id.*; *see also Torres v. Colvin*, No. 3:16-cv-809 (JAM), 2017 WL 1734020, at *3 (collecting cases remanding for calculation of benefits only where Commissioner fails to meet Step Five burden).

The significant delay in this case also merits remand for calculation only. *See, e.g.*, *McClain v. Barnhart*, 299 F. Supp. 2d 309, 310 (S.D.N.Y. 2004). Ms. Shailer-Solak first submitted her claim in 2011; she has not worked since then, and has endured a denial, an appeal to the district court, remand, two hearings, and a subsequent second denial. Ms. Shailer-Solak is entitled to her benefits without further delay. *See Torres*, 2017 WL 1734020, at *4 ("Plaintiff's claim has been pending for more than seven years and was already remanded by the District Court once before. I am not persuaded that the Commissioner deserves a third opportunity to

carry her burden."); *Ardito v. Barnhart*, No. 3:04-cv-1633 (MRK), 2006 WL 1662890, at *5–6 (D. Conn. May 25, 2006) ("Given the substantial time that has elapsed since the period in question concluded, and the endless iterations this case has already endured, the Court declines to remand the case to Defendant for reconsideration of Mr. Ardito's claims.").

## IV.     CONCLUSION

For the reasons discussed above, the motion to reverse the decision of the Acting Commissioner is **GRANTED** and the motion to affirm the decision of the Acting Commissioner is **DENIED**. The Acting Commissioner's Decision is **VACATED** and **REMANDED** for the calculation and payment of benefits.

The Clerk of the Court is respectfully directed to enter judgment for Ms. Shailer-Solak, remand this case to the Acting Commissioner for calculation and payment of benefits, and close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 20th day of March, 2019.

　　/s/ Victor A. Bolden　　　　　
Victor A. Bolden
United States District Judge